# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STRATEGIC CAPITAL INV., LLC, | : | |
| *Plaintiff*, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| BILL MILLER EQUIPMENT SALES, INC., | : | No. 17-2174 |
| *Defendant*. | : | |

## **MEMORANDUM**

PRATTER, J.                                                                                                     JANUARY 24, 2019

Sir William Empson considered seven types of ambiguity in the poetry he critiqued.[1] Courts applying Pennsylvania contract law must consider appreciably more.

Plaintiff Strategic Capital Investments and Defendant Bill Miller Equipment Sales, Inc. entered into an agreement. Strategic contends that it is owed a success fee because it introduced Bill Miller to a lender and that lender eventually provided financing which ultimately benefitted Bill Miller. Bill Miller argues that Strategic did not perform all the services required under the contract. And, in any event, the lender did not actually provide the financing to Bill Miller, but instead had a separate agreement with an intermediary company. Both parties moved for summary judgment in favor of their interpretation of the contract. Because the Court concludes that the contract is ambiguous, the Court denies both motions for summary judgment.

---

[1]     Sir William Empson was an influential British poet and critic. His 1930 study of ambiguity in poetry, "Seven Types of Ambiguity," is considered one of the most influential critical works of the 20th century. WILLIAM EMPSON, SEVEN TYPES OF AMBIGUITY (1st ed. 1930).

**BACKGROUND**

Strategic Capital Investments is a financial advisory firm that works with companies in debt and facing other financial challenges. Sidney Cohen is the principal and director of Strategic.

Bill Miller Equipment Sales rents and sells heavy machinery. Lee Murdy is in charge of Bill Miller's finances.

**I. Engagement Letter between Strategic and Bill Miller**

In October 2014, Bill Miller needed to obtain refinancing due to significant financial problems. At the time, Bill Miller was looking to obtain a credit facility of $35 million to repay existing debt and obtain new financing for working capital. Bill Miller intended to use its sizeable fleet of equipment as collateral. On October 20, 2014, Strategic and Bill Miller entered into an agreement by which Strategic would obtain financing for Bill Miller and Bill Miller would pay Strategic a fee for securing a lender. They documented the terms of the agreement in an engagement letter. The six-page letter contains roughly one page of disputed text. The disputed contract language is reproduced below:

1. <u>Scope of Engagement</u>

    - Work with management in reviewing the financial models and the economics of the transaction.

    - Prepare an executive Summary outlining the operations of the Company and the debt we are looking to fund.

    - Work with Financial Institutions in finding acceptable sources of funding.

    - Work with BME in negotiating the terms and conditions of the funding arrangements and closing the funding.

- Negotiate with lenders in obtaining a discount on the Company's debt.

2. <u>Compensation</u>

   As compensation for SCI providing the services described herein and obtaining the new funding, BME and SCI agree as follows:

   (a) A nonrefundable retainer of $15,000 is due and payable to SCI at the execution of this agreement which covers the work to be performed by SCI including due diligence, executive summary and discussion with potential lenders and existing lenders . . .

   [banking information and mailing address excluded]

   (b) BME will reimburse SCI for all reasonable travel and other out-of-pocket expenses in connection with this project.

   (c) BME will pay SCI Success fees as follows;

   - 1.0% (one percent) of the total funding raised from outside banks and financial institutions introduced by SCI that is classified as Senior Debt.

   - 2.25% (two and one quarter percent) of the total funding raised by SCI for debt that is classified as Mezzanine debt.

   - 7% of the amount of the discount obtained from the Company's lenders. E.G. I [sic] SCI is able to negotiate a discount of $3.5 million, the Company would owe SCI 7% of this discount or $245,000.

   The Success Fees as detailed above are due and payable at the time that a commitment has been accepted by BME from a lender introduced to BME by SCI, the lending described in the commitment has been finalized and the funds are available to the Company to repay its debt. BME authorizes the lenders in this transaction to pay the Success Fees at the closing of the respective loans. The Success fees due under this agreement will cover Funding Sources that are introduced by SCI to BME and provide financing/funding to BME for a period of 1 year after signing of this agreement. **If the Company is able to negotiate and close funding from the Financial Institutions listed on Exhibit A, a**

> **Success Fee will not be due to SCI on the Funds raised from these Financial Institutions.**

Engagement Letter at p. 3–4. (Doc. No. 45-4) (emphasis in original).

Mr. Cohen drafted this agreement with an integration clause and both parties agree that all of the terms of the agreement were embodied in the document, and that no other terms existed. The parties signed the engagement letter and entered into an agreement. Bill Miller paid the retainer, which the parties agree covered any work short of actually earning a success fee.

After executing the agreement, Strategic introduced Bill Miller to a potential lender, White Oak. And, on December 16, 2014, White Oak issued a letter of intent or "term sheet." Both parties admit that this was not a final agreement and only the start of negotiations.

## II. Amendment to the Agreement

Around this time, Bill Miller contends that it became dissatisfied with Strategic. Although Strategic disputes this, Bill Miller alleges that Strategic was not performing under the agreement and Bill Miller considered terminating the relationship. Bill Miller asked Mr. Cohen to reduce Strategic's success fee.

On December 22, 2014, Strategic drafted an amendment to the agreement.[2] The parties agree that the amendment reduced the Success Fee but dispute whether it also modified the terms under which Strategic could earn a Success Fee. The amendment stated that the "Success Fee will be reduced to ½% from 1% and paid as detailed in the Engagement Letter." Amendment at p. 1 (Doc. No. 45-7). The amendment further states that Strategic's responsibility is to "Work with White Oaks [sic] and BME in the final due diligence process, work with BME and White

---

[2] The Court notes that Strategic alleges it did not enter into the amendment willingly, but Bill Miller forced it to do so by threatening to pull out of the agreement 15 minutes before a meeting with White Oak.

4

Oak in negotiating the Loan Agreement including the respective covenants, terms and conditions and work closely with both parties to close the loan in accordance with the Term Sheet. [sic] And the Loan Agreement." *Id.* All other terms and conditions detailed in the engagement letter remained in effect.

## III. The White Oak Deal Falls Apart

After White Oak and Bill Miller executed the letter of intent, the negotiations started to go awry. Bill Miller contends that due diligence moved too slowly and, given the company's financial constraints, it needed to pursue other financing options if the parties could not reach agreeable terms.

In January 2015, White Oak proposed a new term as a prerequisite of providing financing: Bill Miller was to conduct a Phase I environmental inspection of its real estate. Both Bill Miller and Strategic agreed that the new term was inappropriate because Bill Miller's real property was not part of the collateral for the loan. They also agreed that the inspection would be expensive and time consuming. Bill Miller sent an email documenting its concerns, but White Oak insisted on the inspection.

Although Strategic alleges that the deal was 30 days from closing if Bill Miller agreed to conduct the inspection, both parties agree that Bill Miller was free to walk away from the loan. As of January 20, 2015, White Oak viewed any financing with Bill Miller as a "dead deal" because the parties could not reach mutually agreeable terms.

Strategic tried to keep the deal alive by scheduling a call on January 25; however, White Oak refused to budge. Prior to the call, Mr. Cohen e-mailed White Oak and stressed Bill Miller's financial troubles. He stated that "any rational financial guy would try to resurrect the WO deal." Cohen E-mail (Doc. No. 45-15). Bill Miller felt that this undermined its bargaining

position.  Strategic contends that White Oak was already fully aware of Bill Miller's financial position because White Oak had just done due diligence on the company.

Bill Miller tried to reach a final compromise with White Oak on January 29, 2015.  The company sent White Oak a request to provide assurances as to how White Oak would handle issues that might arise out of the inspection and provide a definitive list of the due diligence needed for closing.  Bill Miller believes that Mr. Cohen pushed White Oak to turn down Bill Miller's terms.  Strategic disputes this.

Bill Miller and Strategic agree that Bill Miller was still negotiating terms with White Oak at this time and there was no commitment letter, let alone a loan and security agreement or term note.

**IV.    Bill Miller Terminates the Relationship with Strategic**

On January 29, 2015, Bill Miller asked Mr. Cohen to stop reaching out to lenders and Strategic made no further efforts to obtain financing on Bill Miller's behalf.  Bill Miller also requested financial models from Strategic that were due under the "scope of engagement" terms in the agreement.  To date, Strategic has not given Bill Miller the models.

**V.    Bill Miller's Further Attempts to Secure Financing**

In February 2015, Bill Miller engaged Charlie Snyder to help secure financing.  Mr. Snyder introduced Bill Miller to Element Finance.[3]  After Mr. Snyder learned that Element would not be able to pay him a fee, Mr. Snyder backed out of the transaction and asked Bill Miller and Element to negotiate directly.  Strategic admits that it did not make the introduction between Element and Bill Miller nor did Strategic suggest that Bill Miller contact Element.

---

[3]    Mr. Cohen was apparently aware that Element might be interested in providing financing to Bill Miller but allegedly told one of his associates not to make the introduction.  Strategic disputes this.

On March 26, 2015, Bill Miller and Element entered into a term sheet or letter of intent on the terms for potential lending between the parties. Over the next several months, the parties conducted due diligence.

### A. *Element Looks for a Partner in the Loan*

Element sought a subordinated partner to take on some of the loan and the risk of the Bill Miller deal. The goal was for the subordinated partner to take a secondary position in the assets and improve Element's position. White Oak was at least one, if not the only, party interested in the role. The negotiations between White Oak and Element took place approximately three months after the original White Oak deal fell apart. Both Element and White Oak confirmed that neither Bill Miller nor Strategic had anything to do with Element's decision to contact White Oak.

White Oak ultimately wanted to be a part of the deal and, as a result, Element informed Bill Miller of the negotiations. Although Bill Miller was "fine" with White Oak's involvement in the deal, Mr. Murdy expressed concern that Bill Miller might owe an additional fee because of it. In an email on May 20, 2015, Mr. Murdy said, "The agreement we had signed with Sidney Cohen indicated a fee would be due to Sidney in the event we finalize lending with any lender he had introduced to us." May 20, 2015 Murdy E-mail (Doc. No. 45-25). He asked for assurances that White Oak's participation would not impose additional fees on Bill Miller, but Element said that Bill Miller would have to pay any additional fees, in the event they were necessary.

### B. *Element Issues a Commitment Letter and the Element-Bill Miller Deal Is Finalized*

Days after this email exchange, on May 26, Element issued a commitment letter. Element agreed to provide Bill Miller with a loan without a Phase I environmental study, which

White Oak had required during its negotiations with Bill Miller. The commitment letter itself only refers to one lender, Element Financial Corp. Commitment Letter (Doc. No. 45-27).

Bill Miller and Element entered into a final agreement on June 30, 2015. Element agreed to two loans: a $25 million term loan and a $5 million capital expenditure loan. The term loan agreement (the only loan at issue in this case) refers to Element as the lender; however, it also calls Element the "Agent for Lender**s**" plural. Final Agreement (Doc. No. 45-28) (emphasis added).

### C. *Element Enters into an Intercreditor Agreement with Macquarie and White Oak Purchases that Interest*

On June 30, 2015, Macquarie US Trading LLC purchased a portion of the Bill Miller-Element loan from Element, ostensibly on behalf of White Oak. Apparently, White Oak does not maintain liquid capital and, as a result, uses a "warehouse facility" such as Macquarie to fund a transaction. Macquarie is a separate legal entity from White Oak and is not a fund controlled by White Oak.

Element agreed to sell and assign a 68% interest, or $17 million, in the Bill Miller-Element loan to Macquarie. Element retained the remaining 32% interest. On June 30, 2015, Macquarie wired the funds to Element to purchase the $17 million interest and the companies executed an assignment.

About a month later, on July 23, White Oak purchased Macquarie's $17 million interest in the Bill Miller-Element loan via an assignment. Strategic claims it is entitled to a success fee on this $17 million.

White Oak apparently did not provide any funds on the date of closing. And both White Oak and Element confirm that Bill Miller had nothing to do with how Element structured its

agreement with Macquarie and White Oak. However, all three lenders (Element, Macquarie, and White Oak) were involved in negotiating and making changes to drafts of the Intercreditor Agreement.

Bill Miller contends that it only paid Element for the first year after the Element-Bill Miller deal was finalized (although Strategic alleges that it made payments to White Oak at closing). In fall 2016, White Oak apparently became dissatisfied with Element's handling of the loan and took over directly. Bill Miller alleges that this is the first it heard that White Oak was a party to the deal; however, there are earlier emails with Mr. Murdy expressing concern about White Oak being a party to the deal and Mr. Murdy was also copied on an email that included a representative from White Oak.

Bill Miller also contends before the Court that it had never heard of Macquarie prior to discovery in this case. That being said, Mr. Murdy was copied on an email discussing Macquarie on June 30, 2015. (Doc. No. 52-16).

## LEGAL STANDARD

A court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cnty. of Bucks,* 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson,* 477 U.S. at 248). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.* (citing *Anderson,* 477 U.S. at 248). Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the non-moving party. *See Anderson,* 477 U.S. at 255. However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient

9

to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.,* 621 F.3d 249, 252 (3d Cir. 2010).

The movant bears the initial responsibility for informing the Court of the basis for the motion for summary judgment and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. After the moving party has met the initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

## DISCUSSION

Both parties moved for summary judgment. Bill Miller seeks summary judgment on all of Strategic's claims and Strategic seeks partial summary judgment on the meaning of Section 2(c) of the parties' agreement. The motions can be addressed together because they turn on the same fundamental issue – whether the contract is ambiguous or not. The Court concludes that the contract is ambiguous and, thus, denies both motions.

## I. General Principles of Pennsylvania Contract Law

The parties agree that Pennsylvania contract law governs this case. "Pennsylvania law on contract interpretation and ambiguity is somewhat complicated; while the broad principles are clear, it is not a seamless web . . . ." *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 92 (3d Cir. 2001). "[S]ummary judgment is appropriate only where the contractual language is unambiguous—*i.e.,* 'subject to only one reasonable interpretation.'" *Mylan Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413, 419 (3d Cir. 2013) (quoting *Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co.,* 180 F.3d 518, 521 (3d Cir. 1999)) (discussing New Jersey contract law). "Under Pennsylvania law, ambiguous writings are interpreted by the fact finder and unambiguous writings are interpreted by the court as a question of law." *Mellon Bank*, 619 F.2d at 1011 n.10; *see also Metzger v. Clifford Realty Corp.*, 476 A.2d 1, 5 (Pa. Super. Ct. 1984) (stating that although "courts are responsible for deciding whether, as a matter of law, written contract terms are either clear or ambiguous; it is for the fact finder to resolve ambiguities and find the parties' intent").

A court's goal in interpreting a contract is to "ascertain the intent of the parties as manifested by the language of the written instrument." *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 469 A.2d 563, 566 (Pa. 1983). And, when a contract's language is clear, "a court is required to give effect to that language." *Id.* However, an "ambiguity is present if the contract may reasonably be construed in more than one way." *Wert v. Manorcare of Carlisle PA, LLC*, 124 A.3d 1248, 1259–60 (Pa. 2015).

"Ambiguity in a contract can be either patent or latent." *Bohler-Uddeholm*, 247 F.3d at 93. A patent ambiguity appears on the face of the contract and occurs when the language used is defective, obscure, or insensible. *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604,

613–14 (3d Cir. 1995) (citing *Allegheny Int'l, Inc. v. Allegheny Ludlum Steel Corp.*, 40 F.3d 1416, 1424 (3d Cir. 1994)). "In contrast, a latent ambiguity arises from extraneous or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous." *Steuart v. McChesney*, 444 A2d 659, 663 (Pa. 1982); *see also Bohler-Uddeholm*, 247 F.3d at 93.

To determine whether a contract term is ambiguous, a court "must consider the actual words of the agreement themselves, as well as any alternative meanings offered by counsel, and extrinsic evidence offered in support of those alternative meanings." *St. Paul Fire and Marine Ins. Co. v. Lewis*, 935 F.2d 1428, 1431 (3d Cir. 1991). Courts should not, however, overanalyze contract language to the extent that doing so creates ambiguities where there are none. *Id.* (citing *Pacific Indem. Co. v. Linn*, 766 F.2d 754, 761 (3d Cir. 1985)).

## II. Competing Interpretations

Here, both sides claim that the contract language is clear and that the Court should rule in their favor. The Court recognizes that a contract is not ambiguous simply because the parties disagree on its meaning. *Bohler-Uddeholm*, 247 F.3d at 93. In this case, however, the parties' competing interpretations of the contract highlight the contract's patent ambiguities.

### A. *Strategic's Proposed Interpretation*

According to Strategic, the Court should focus on one sentence in Section 2(c). The language states: "The Success fees due under this agreement will cover Funding Sources that are introduced by SCI to BME and provide financing/funding to BME for a period of 1 year after signing of this agreement." Engagement Letter at p. 4. (Doc. No. 45-4). Strategic believes that this language unequivocally demonstrates that it is entitled to a commission so long as Strategic can prove it introduced Bill Miller to a lender and Bill Miller subsequently got a loan from that

12

lender. There is no dispute that Strategic introduced Bill Miller to White Oak (although it is not entirely clear that White Oak provided financing or funding *to Bill Miller*).[4]

In support of this interpretation, Strategic points to an email from Lee Murdy, who oversees finances at Bill Miller, in which he stated:

> A third party, Sidney Cohen, had introduced us to White Oak. The agreement we had signed with Sidney Cohen indicated a fee would be due to Sidney in the event we finalized lending with any lender he had introduced to us. We will need Element to represent to us that no additional fees will be due from BME as a result of White Oak [sic] involvement and that Element will defend BME if such fee claims are made.

May 20, 2015 Murdy E-mail (Doc. No. 45-25). According to Strategic, this email demonstrates that Bill Miller had, at least at some point, a similar interpretation of the contract as the one Strategic now proposes.

### B. *Bill Miller's Proposed Interpretation*

Bill Miller believes that the contract should be read in its entirety instead of selecting one sentence. It contends that the contract is full of conditions precedent that Strategic has, undisputedly, not performed. In short, Bill Miller believes that Strategic needed to perform the services listed in the "scope of engagement" section (as amended by the amendment letter), actually obtain the funding, and satisfy the terms in the "success fees" paragraph.

The "Scope of Engagement" section lists the five following actions: (1) "Work with management in reviewing the financial models and the economics of the transaction," (2) "Prepare an executive Summary outlining the operations of the Company and the debt we are looking to fund," (3) "Work with Financial Institutions in finding acceptable sources of

---

[4] Strategic also argues that this interpretation is supported by Pennsylvania's "procuring cause" and "finder's fee" doctrines. Neither of these is applicable, as Strategic's counsel admits in briefing, because parties are free to contract around them and the parties undisputedly did so in this case. Pl.'s Mot. for Partial Summ. J. at p. 11 (Doc. No. 46).

13

funding," (4) "Work with BME in negotiating the terms and conditions of the funding arrangements and closing the funding," and (5) "Negotiate with lenders in obtaining a discount on the Company's debt." Engagement Letter at p. 3. (Doc. No. 45-4). The December 22, 2014 amendment stated that Strategic was no longer responsible for providing "an auction process for BME with a number of lenders" or preparing "an executive summary and other financial data of BME." Amendment at p. 1 (Doc. No. 45-7). All other terms in the engagement letter remained in effect. *Id.*

Bill Miller argues that the "Compensation" section includes further conditions precedent that Strategic ignores in favor of one sentence. According to Bill Miller, the Court should read the following provision as including six conditions precedent into the contract:

> The Success Fees as detailed above are due and payable at the time that **[1]** a commitment has been accepted by BME **[2]** from a lender introduced to BME by SCI, **[3]** the lending described in the commitment has been finalized and **[4]** the funds are available to the Company to repay its debt. BME authorizes the lenders in this transaction to pay the Success Fees at the closing of the respective loans. The Success fees due under this agreement will cover **[5]** Funding Sources that are introduced by SCI to BME and **[6]** provide financing/funding to BME for a period of 1 year after signing of this agreement. . . .

Engagement Letter at p. 4. (Doc. No. 45-4) (emphasis and numbering added).

Bill Miller points out that Strategic never provided the requested financial models, played no part in the negotiations with Element, and did not find an acceptable lender–all of which it alleges were conditions of earning a success fee. Bill Miller further contends that Strategic did not even introduce Bill Miller to Element, who was the actual lender in the final deal. According to Bill Miller, any financing Element got from White Oak was separate from the financing Bill Miller got from Element.

14

### III. Analysis

In this case, on the sole basis of the contract itself the Court cannot achieve its goal of ascertaining the intent of the parties in forming this contract because the contract is ambiguous. Both parties present reasonable interpretations and a factfinder should decide which interpretation holds water.

Strategic contends that the contract is simple: Strategic is owed a fee if Bill Miller received a payment from any lender that Strategic introduced to Bill Miller at any earlier point in time. This interpretation is compelling in its simplicity and makes some sense. The goal of this contract was to find a lender for Bill Miller. Only the lenders listed in Exhibit A would fail to earn Strategic a success fee and there is no dispute that White Oak was not on that list. Mr. Murdy's email also presents compelling evidence that he interpreted the contract similarly.[5] It arguably shows that he was worried Bill Miller might owe Strategic a success fee if White Oak was involved in the Element deal. However, if the contract's language were as clear as Strategic alleges it is, Strategic would not need to present this parol evidence to bolster its case.

Furthermore, if the Court subscribed to Strategic's reading of the contract, it would be forced to allow one sentence to control the entire document, requiring the Court to ignore all of the other provisions that the parties allegedly carefully considered in drafting this contract. "A court cannot interpret words in a vacuum, but rather must carefully consider the parties' context and the other provisions in the plan." *In re New Valley Corp.*, 89 F.3d 143, 149 (3d Cir. 1996),

---

[5] Bill Miller argues that the Court should ignore the email because the contract is unambiguous. Courts should not look to parol evidence, such as this email, when a contract is unambiguous. *Beta Spawn, Inc. v. FFE Transportation Services, Inc.*, 250 F. 3d 218, 227 (3d Cir. 2001) (quoting *Harley-Davidson, Inc. v. Morris*, 19 F.3d 142, 148 (3d. 1994)). In the case of ambiguous contracts, however, a court may consider extrinsic evidence to try and reconcile the ambiguity. *Id.* (citing *In re Herr's Estate*, 161 A.2d 32, 34 (Pa. 1982)). Because the Court considers this contract ambiguous, it can consider extrinsic evidence.

*cert. den'd* 519 U.S. 110 (1997) (applying the federal common law of contract); *see also Meeting House Lane, Ltd. v. Melso*, 628 A.2d 854, 858 (Pa. Super. Ct. 1993) ("One part of a contract cannot be interpreted so as to annul another part, and a contract must be construed, if possible, to give effect to all of its terms."); Restatement (Second) of Contracts § 90 (Am. Law Inst. 1981) ("An interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect[.]").

Strategic's interpretation presents other problems as well. For example, under this reading, Strategic could have simply introduced Bill Miller to White Oak and then refused to otherwise participate in the negotiations and still be owed a success fee. Furthermore, ambiguous contract terms, such as these, should be interpreted against the drafter, which was Mr. Cohen of Strategic in this case. *Meeting House Lane*, 628 A.2d at 858; *see also Maule v. Phila. Media Holdings, LLC*, No. 08-3357, 2010 WL 914926, at *6 (E.D. Pa. Mar. 15, 2010).

In contrast, Bill Miller asks the Court to read the contract in its entirety and find that Strategic failed to perform under it. This argument has its own merits. The parties listed a number of actions that Strategic never completed. And, there is the added wrinkle of whether White Oak provided funding *to Bill Miller* or whether it is more accurate to say that White Oak provided funding to Macquarie and Element, which then ultimately helped Bill Miller.

But there are problems with this interpretation as well. Although the Court recognizes that Mr. Murdy's email is only one piece in the factual puzzle of this case, it certainly lends credence to Strategic's interpretation of the contract and it should be for a jury to decide what he intended with his words.

Additionally, the so-called conditions precedent are not as obviously requirements for a success fee as Bill Miller makes them out to be. A "condition precedent may be defined as a

16

condition which must occur before a duty to perform under a contract arises." *Acme Markets, Inc. v. Fed. Armored Exp., Inc.*, 648 A.2d 1218, 1220 (Pa. Super. Ct. 1994); *see also Mellon Bank*, 619 F.2d at 1016 ("The rule in Pennsylvania is that a condition precedent to an obligation must be expressed by clear language or it will be construed as a promise or covenant. Language not clearly written as a condition precedent is presumed not to be, unless the contrary clearly appears to be the intention of the parties."). Although "the parties to a contract need not utilize *any* particular words to create a condition precedent, an act or event designated in a contract will not be construed as constituting one unless that clearly appears to have been the parties' intention." *Acme Markets*, 648 A.2d at 1220 (emphasis in original).

In this case, there was no express language or clear indication that Strategic had to complete all of the duties listed under the "Scope of Engagement" and "Compensation" sections to earn a success fee, as Bill Miller contends. Logically, Strategic likely did not have to complete all those duties to earn a success fee. For example, if Bill Miller and White Oak were able to finalize their original negotiations, there would be no doubt that Bill Miller owed Strategic a success fee even though Strategic had not completed all of its so-called obligations.

Although both sides present plausible, albeit competing, interpretations of the contract, the Court is not convinced by either one, or any other reading the Court itself can glean. As such, the Court denies both motions for summary judgment. It will be up to the factfinder to decide what this contract means and whether Strategic is entitled to a success fee.

**CONCLUSION**

For the reasons set out in this Memorandum, the Court denies the competing motions for summary judgment. An appropriate order follows.

BY THE COURT:

/s/ Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE